The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. All right, the first argued case is number 2014-25, Corphotonics, Ltd. v. Apple Inc. Mr. Gayasa, proceed. Thank you, Your Honor. Good morning. May it please the court. My name is Robert Gayasa from Roth Augustin Cabot, appearing on behalf of Appellate Court Photonics. There are two primary issues presented in this appeal. First, whether this court's opinion in ARTHREX had a constitutionally curative effect on the appointment of APJs immediately upon issuance, and therefore before the board's final written decision here, or whether that curative effect occurred when this court issued its mandate in ARTHREX and therefore after the board's final written decision here. Counselor, this is Judge Verena. I'm interested in this part of your argument that has to do with the mandate having not yet issued at the time of the final written decision. Can you address that part of your argument? Happy to, Your Honor. So, in the simplest terms, I think the question boils down to whether immediately upon issuance of the ARTHREX opinion on October 31, 2019, was the Secretary immediately empowered to constitute PTAP boards with APJs that could be removed without cause in the protections of Title V, as this court held in ARTHREX? And only if that were true could the final written decision here on December 2 be potentially constitutional. And the answer to that question, we believe, is no, for two reasons. First, there does not appear to be any dispute that only this court's mandate ends in appeal, including in the ARTHREX case, and returns jurisdiction to the agency to carry out the mandate in the court of this court's opinion. That fairly means that the Secretary or Director could not reconstitute a board of properly appointed APJs in ARTHREX until the mandate issued. And there's no reason to believe that they could do so in any other case until they're required to do so, either by that mandate in ARTHREX or a mandate in another case. Why does that render our decision ineffective? Now, I realize the purpose and the objective of the mandate and how that fits into your argument, but why would our decision not take effect? So there's two aspects of that, Your Honor. The first is what the mandate does. And what the mandate does is it returns jurisdiction to the agency to carry out what the court said in its opinion and its judgment. And because of that, only when that's actually issued could the agency, a party here, do that. And, indeed, there's no reason for a co-equal branch of government to be afforded fewer procedural rights than a private party would have under FRAP 35 and 40 and 41 to seek rehearing the court's opinion before it had binding effect. Put simply another way. Right. But that's in the particular case. I thought the point of our decision is in Caterpillar, was that whatever the director could have done in the ARTHREX case itself, as soon as ARTHREX came down, it had precedential effect, and that meant that if the director felt like firing one of the board judges the next day, he would have had the legal authority under the precedent to do that. The mandate has only to do, doesn't it, with what happens in the particular case you're talking about, not the precedential effect. In the particular case, yes, Your Honor. I believe what the mandate does is it empowers the director, the secretary, to carry out what the court said in its opinion and judgment in ARTHREX. But the story besides this point, that precedent, that is indeed the main premise of Apple's or PTS theory for the immediate binding curative effect of ARTHREX on the agency. But there's several issues with that theory. First of all, are you making an argument that you agree or is contrary to our governing precedent, or do you think we don't actually have a governing precedent on this? Well, to be clear, our reading of Caterpillar, we think a fair reading of Caterpillar is that this particular question has not been decided because in Caterpillar the argument was whether or not issuing the final written decision after ARTHREX, it doesn't cure a year's worth of constitutional violations. And what this court did is it said the motion of vacay was denied on that basis of that argument. So I don't believe the argument that we're making today was fairly presented in Caterpillar. If the court decides otherwise and that Caterpillar is binding precedent, we would ask it to take it up and bond. But I do believe that the answer to your question, your previous question, Your Honor, there is a difference between precedential effect and the mandate. Precedential effect has immediate stare decisis effect. That's a different question with different interests at play. Indeed, it goes to the relationship between tribunals, inferior tribunals and reviewing appellate courts, and there's a strong interest there for adherence to opinion itself. But here the question is to the binding effect of an opinion on an agency in a case that's a party to that case. And that agency, because of the co-equal branch of government, should not be afforded fewer procedural rights than a party would have under the rules. In other words, put simply, the ARTHREX opinion could not by itself. I'm sorry. Maybe I'm confused about the following. You talk about somehow the agency having fewer rights. The remedy portion of the ARTHREX decision gave the agency more rights. That's not fewer rights. What it said was from this day forward, the director has a new power over the board members. That is true, Your Honor. And as a matter of precedent, that would kind of go to the second point I had. It is a very interesting question what that remedy actually did, if you're talking about the precedent giving that power to the agency, because I'm not sure that's actually true, because as precedent alone, without effect of the mandate authorizing that action, returning to kind of my initial hypothetical and the question that was raised before, if the APJ were removed without cause, was that permissible under the precedent of this court? And I think the answer is we don't know. And we don't know that for one particular reason. If an APJ were removed, and then they would be sought. I'm sorry. Presumably by the secretary, not by the director, but go on. Correct, yes. Excuse me if I misspoke. No, no. I misspoke. Sorry. If an APJ were removed after the ARTHREX opinion issued, based on the precedent of ARTHREX, if that APJ wished to challenge that removal and were seeking relief purely under the CSRA, this court's ARTHREX opinion would likely be binding on the MSPB, a party not a court, and the MSPB would likely have to dismiss for lack of jurisdiction. But if that cause were brought by the APJ as a mixed case under PERI, even that jurisdictional dismissal would end up being appealed to a district court and then a regional circuit. Those courts would not be bound by ARTHREX and would have to decide the appointments clause issue and Title V severance remedy issue again and did not have to agree necessarily with this court's precedent. The only point that would change that outcome could be the mandate in ARTHREX. That mandate in ARTHREX ordered compliance by the agency with the court's opinion. So in that instance, the way the construct would work, I believe, is that the mandate would allow the agency to appoint APJs or form a board of APJs that it could remove under this court's precedent. But again, if those APJs challenge that removal and raise the claim of discrimination, it would be a mixed case, it would go to the regional circuits, and those regional circuits would not have to abide by this court's precedent. And that's why the precedent itself would not necessarily bind and empower the agency besides the mandate to then remove APJs without cause. Counselor, I'm not clear on your use of sur decisis and your reference to that. If the doctrine has application at all here, it would be in a strict application or decision in Caterpillar, wouldn't it? I mean, sur decisis goes to judicial opinions, not agency actions. Yes, Your Honor, that's true. So that's another reason why sur decisis wouldn't necessarily bind the agency. But Caterpillar certainly... But it binds this court, right? I mean, we did issue Caterpillar, and that's pretty clear, and it seems to encompass your case except for the timing. But if we look at the timing now, why don't we just say apply sur decisis, as you're urging us to do, and find the Caterpillar controls? Caterpillar, Your Honor, we believe is not binding because the argument we raised here was not raised in Caterpillar fully. Caterpillar was decided based on the issue of having... But the holding of Caterpillar is what applies here. Yes, Your Honor. The holding of Caterpillar, though, was simply to vacate and remand... Sorry, the motion to vacate and remand was denied. The court did not explain why it was being denied. What it did was it said, unlike prior cases, and then it talked about the arguments between the parties, and then it denied it. It didn't necessarily give any of the reasoning underlying that itself. There was a citation to one of the concurrences in denial of rehearing, but it did not expressly adopt that. And if it did, Your Honor, if the panel does feel that Caterpillar is binding precedent on it, then we would ask that it take the issue in bond because the precedent effect... Sorry, the decisive effect could not apply to the agency immediately. Because it's an agency, it's not an inferior tribunal that would necessarily have to follow this court's precedent in removal proceedings for APJs. And the clearest example I could find of that, Your Honor, is the mixed case. If an APJ raised a mixed case, that precedent would not be binding on a removal. Indeed, it could go to the Fourth Circuit, one of the other circuits. They could disagree about the severance remedy. They could disagree about the unconstitutionality of the appointments of APJs. And they could say that they had remedy under the CSRA and removal protections of Title V, which would directly conflict. And in that way, the only other possibility would be one of the options that Judge Dyke suggested in his dissent to the denial of rehearing in Arthrex, which was discussing the difficulty of identifying at what point in time the appointments become effective. And I think at that point, the next one would be the Supreme Court affirmance. Only that Supreme Court opinion would necessarily resolve the issue for all the circuits and determine whether or not finally, as a matter of precedent and stare decisis, that in any case, mixed case or otherwise, APJs did not have the rights afforded to them by statute under the CSRA. If there's no further questions, I see that I'm in my rebuttal time. Well, I think we'd like to hear some of your argument on the merits of the appeal as well. So let's... How about restarting the clock for 10 minutes in addition for Mr. Gayarza? And let's turn to the merits of the appeal. Certainly. Thank you, Your Honour. So the dispute on the merits is a very straightforward dispute. It's whether the board of prior reference discloses outputting a composite image with the claimed, quote, point of view of a first camera. And that boils down to the meaning of point of view in the claims. Yeah, I don't see in your blue brief a claim construction challenge. So we raised it in... I believe it's fairly raised on pages 28 to 34 of the blue brief, Your Honour. And specifically what we said on page 28, we said border discloses this, and then we continued on and said that as core photonics argued before the board, the term point of view should be construed as camera angle. We then explained why under our reading of camera angle, and I'm happy to talk about that. Right. So on page 28, it says, as we argued, and then it says, however, regardless of whether point of view is expressly construed, and now it's back to border. I don't think for a claim construction issue that is not self-evident on its face, and I think this definitely falls into that category. I don't see how that's a preservation of an actual claim construction argument under a BRI standard looking at the spec, looking at all the stuff you would do in claim construction. And the reason I focus on this is that it seems to me, while you have at least taking the board's opinion with one possible exception as a given, you have an argument about when the angle of the camera shifts, you may actually see something from one angle that you don't see from the other, at which point if you're just taking the two images, they can't possibly be from the same camera angle. But on the other hand, if the two images are from the same camera angle, at least materially the same camera angle, then the flat triangle, circle, rectangle, diagram of border would seem to do it. So two responses, Your Honor. I just want to unpack your question. The first point about the potential not raising it in the open brief. On page 28, that sentence that starts, however, I think the best read of that is saying that it's a plain meaning because it's so simple. And that's exactly what we're talking about, as you said, Your Honor. Okay. Well, then suppose I disagree that it's a plain meaning because quite a lot of the spec seems to be about something different from that. And the one piece of the spec that is this phrase, e.g., camera angle or just parenthesis camera angle, which certainly works in your favor, but I don't see that under a broadest reasonable interpretation that it would be unreasonable to say that the spec, when it talks about point of view, includes something other than different camera angles, in which case all this business about parallax and tilt wouldn't actually be included in the required claim element. So I think the answer to your question, Your Honor, is very straightforward based on the claim construction that we proposed. And that can be found at pages 871 to 872 of the appendix. And mainly, under a BRI standard, it has to be the broadest. And the broadest interpretation of point of view fairly would be that point of view has multiple aspects, position, and also perspective. And that's exactly what we said to the Board in our claim construction argument for point of view. If you turn to page 872... I'm sorry. I'm not sure that's right about what the broadest. The broadest coverage of the claim would be that two different cameras or two different lenses have different point of views even if they don't have different camera angles. That's broader than saying for there to be a different point of view between camera 1 and camera 2, they have to be from different camera angles. I think the dispute here would be about the meaning of the term point of view. So the broadest interpretation of point of view is that it encompasses all aspects of point of view itself. As we argued on page 872, to a posse that would understand that because there are two cameras and images with different angles, a given object will be shifted and have a different perspective, that shape, and also the position, the shift of the object. So those different shapes, including the potential occlusion and the shapes are what the claim convention is addressing, but admittedly, Boulder does not address different shapes. I think, counsel, that this argument lands right on the decision point of the merits. It's because you're arguing that Boulder doesn't teach that an output image from a point of view of the first camera as required by the claim. That's your argument. But yet, when the experts got around to testifying, your expert could not testify about stitching, and that leads to this point where we're at. And he said he wasn't an expert in the case, so the board did not give your expert as much weight. Am I viewing this correctly? That is true, Your Honor. The board did not give our expert as much weight, but the fundamental issue is whether Apple's expert applied the correct claim construction and the meaning of point of view to Boulder, and we suggest it did not. Because what Boulder does, as we discussed... That aside, your argument, regardless of the claim construction, is that Boulder does not teach providing an output image from the point of view of the first camera. That's your argument, but yet your evidence doesn't back up your argument. Well, respectively, Your Honor, we do believe that it does if the correct construction of point of view is adopted. Because the correct construction of point of view is that point of view requires perspective and position. And what Boulder does is it just does scaling, and through that stitching and homography, it changes the position of XY coordinates of the objects in the secondary image to match the position in the primary image. But your expert wasn't able to testify as to the stitching part of that argument you just made. Even if our expert were not able to do that, Your Honor, Apple's expert would still have to apply the correct construction and say that Boulder... And the board would also have to conclude that Boulder did disclose both position and perspective. And so that construction of point of view, that is both position and perspective, is important. And I think on page 872 of the record, we made that very clear to the board, that a point of view to a placida is not just position, as in Boulder and prior art references. It's also perspective. And in the 152 patent, there is a disclosure of a detailed algorithm on columns 7 to 9 of the patent that uses demosaicing, registration of luminance on images to avoid color artifacts, and other correspondence metrics all executed on a pixel-by-pixel basis. Were these claim construction arguments made before the board? Yes, they were, Your Honor. Why were they not made in your opening brief? I think they were fairly made in the opening brief because what we're talking about in the opening brief, Your Honor, on pages 28 to 34, is how Boulder does not disclose adapting towards and accommodating perspective. That's the point I was making. That's the main argument, whether Boulder discloses an output image from a point of view of the first camera or not. Yes, that's premised on... And that's your argument. That's correct, Your Honor. It's premised on the meaning of a point of view as to whether the point of view is position alone, as Apple assumed in its argument and as the board assumed by rejecting on pages 7 to 8 of the appendix our claim construction and saying it wouldn't have any... Just setting aside claim construction, when you argue the point of view of the first camera with respect to the point of view of the second camera, your argument is on the stitching position, but you weren't able to provide evidence to support your stitching argument, and I think that's central to what you're saying now. You can help me out with this and let me know if I'm correct with that or not. Certainly, Your Honor. I don't believe there's any dispute that what Boulder teaches in the portions of Boulder that was relied on by the board. Boulder teaches stitching and homography as put in the petition, Apple's petition, at pages 149 to 50 of the appendix and page 28 of Apple's red brief. Does Boulder teach an output image from the point of view of the first camera? Not a point of view as correctly construed under the 152 patent because Boulder only changes position. It does not account for perspective, the shape of the objects themselves. And what Boulder does, if you look at a blue brief on page 30, what Boulder does is it uses these matrices and that algorithm to simply shift by one kind of factor, shift the position of the first image into the second. Please continue your thought. Thank you, Your Honor. It shifts the position of one image to the other. But I don't believe there's any dispute here that on the portions of Boulder reference that were relied on by the board that it does not accommodate changes in perspective. And as we said to the board very clearly on 872, point of view in the patent requires not just position but also perspective. And that perspective is a change in shape. As you see in the picture that we put up of the buildings on page 29, the circled images, the circled portions of the decorations on the posts, there are different shapes in two of the pictures. And that is essentially exactly what a procedure would understand point of view to be in this patent, that it's not just position like Boulder did, but it's also perspective, and perspective is necessary. And that's the inventive aspect of this invention as shown by the algorithm that's disclosed in detail in columns seven to nine of the patent. And unless there's any further questions, I'm happy to address any further ones on rebuttal. Okay. Anything else for Mr. Garcia at the moment? No, thanks. No, thank you. Good. All right. Thank you. Then we'll hear from the other side, counsel for Apple, Ms. Oliver. Thank you, Your Honor. And may it please the Court. This is Angela Oliver on behalf of Apple. The Court should affirm the Board's decision because this appeal is not eligible for an Arthrex remand and the Board's obviousness and determination is fully supported in the record. As to the first issue regarding Arthrex, this appeal is not eligible for a remand because the final written decision issued after Arthrex. As this Court has already alluded to this morning, this Court's decision in Caterpillar fully resolves this issue. The facts of that case cannot be materially distinguished from the facts of this case. I think Mr. Garcia's position is that I don't think he said the facts were any different, he just said that the arguments were different. That is, I took him to be saying that there was no argument specifically about mandate or some other aspect of the argument he's making was not, he may have said something like as fully developed or not developed at all, not that there was actually any difference in the scenarios, the relevant facts. Yes, that's correct, Your Honor. We simply emphasize that the holding in Caterpillar is what should govern here. And the reasoning cited in Caterpillar, although it did not address this mandate argument, it did cite Judge Moore's concurrence in the denial of rehearing, which explained that APJs were constitutionally appointed as of the implementation of the severance. What do you make of Mr. Garcia's argument? Obviously this is not for the panel if we think Caterpillar decides it, but his point that conceivably even as to the Arthrex petitioner itself, I'm not entirely sure, but as to others, because of the mixed case division of reviewing authority, if the secretary's authority by way of the remedy in Arthrex to fire a board member got challenged and the challenge included a discrimination claim,  but go to a regional circuit. Sure. Your Honor, two responses to that argument. First, what matters is how the court's Arthrex opinion affects the procedural issues, the IPRs, that this court has jurisdiction over. And with respect to those, this court's opinion in Arthrex is absolutely binding as of the day it issued. With respect to the mixed case scenario where a removal case from the MSPB could end up at another regional circuit, the fact of the mandate eventually issuing in Arthrex would not resolve that problem either. This court in Arthrex provided an interpretation of a statute held that the removal protections do not apply in this particular context. That's an interpretation of a statute and that governs this court's precedent going forward. And as with any interpretation of a statute, another regional circuit is not going to be bound by this court's interpretation of the statute, regardless of the timing of the mandate. And so this court should not delay implementation of Arthrex just because of the practical reality that, as in every case, regional circuits may differ from this circuit with respect to a matter of statutory interpretation. And ultimately that would be an issue, if there is a circuit split, for the Supreme Court to resolve. But what we do know... Perhaps in an employment case, which this isn't. Exactly, Your Honor, that's correct. What we do know is that the holding in Caterpillar addresses this issue based on the timing of the final written decision, in this case. And this court has addressed the mandate argument in other contexts, in non-presidential decisions. For example, of course, in document security systems versus NICHEA, and in a later case, another non-presidential case in INFINIUM. And that analysis is consistent with how other circuit courts have treated this as well. And particularly I'd like to highlight the Ninth Circuit's opinion in Reyes-Hermano-Gomez because that, I believe, addresses the other point that Mr. Garasso has made today, which is that the fact that the government is a party in the R-3-X proceeding, seeking further review of that opinion, does not change the outcome. In the Ninth Circuit's case, a similar set of facts was in play. Now, of course, it was a criminal case, but the government was a party in that case, and the government disagreed with an opinion from the Ninth Circuit, and so the government sought further review of that Ninth Circuit opinion. But yet, despite the fact the government was a party still seeking further review, the Ninth Circuit still held in Germano-Gomez that the opinion that was on further review was still binding as to cases going forward and as to the government in cases going forward in that circuit. And so this court's reasoning in its non-presidential decisions rejecting the mandate argument is consistent with those cases as well. Can I ask you a merits question? I don't want to stop the discussion if others want to continue on the R-3-X, but... Of course you want to. So on the merits, rather a lot, maybe even this morning, everything in Mr. Geyer's argument turns on accepting the claim construction that Core Photonics did argue below that the two lenses have different points of view only if they are shooting from different camera angles. Explain to me what your view of that is, including whether the blue brief fairly raises that claim construction challenge, because the board said we don't actually have to decide that, right? That's correct, Your Honor. So at Appendix Page 7 and 8 of the board's opinion, the board addressed this claim construction argument, but to be clear, what that claim construction argument looked like before the board was not the occlusion-type argument that we're seeing now and that we saw addressed before the board in the factual application context. Excuse me. So the board declined to construe the term whether it be camera angle or viewpoint were the parties' two views before the board because the board correctly acknowledged that it would make no difference as to the issues presented in the case. Now, of course, Core Photonics raised the occlusion argument later before the board with respect to factual application of that. So, of course, occlusion would make a difference to the case in the overall analysis, but yet the board's reasoning shows us that the board was never presented with this occlusion issue as a matter of claim construction. And turning specifically to Your Honor's question regarding whether this is sufficiently raised in the blue brief, I think we see the exact same issue again. Core Photonics suggests that there was a claim construction dispute generally, but never ties that to the occlusion-based arguments it's making. Even on Page 1 of the blue brief, when Core Photonics introduces this issue, it's framed as a substantial evidence question, and it is our position that that is all this is. This was never raised as a claim construction matter before the board or on appeal in the blue brief, and it was only discussed in the context of factual application of the prior art. But regardless, Your Honor, whether this court were to treat that issue  there is still no merit to Core Photonics' argument that occlusion should be read into the claim limitations. At Appendix 23 of the board... I'm not... I don't think I understand the words occlusion should be read into the claim limitation. I take it... I guess I'm not even sure what the distinction is. I take it... If you just look at those two pictures of the Georgian facade of a building, they're taken from different angles, self-evidently, because you can see the side of the building in one and you can't see the side of the building in the other. And that means that if you take... In one of them, you can easily have something that is simply not visible, is occluded, is blocked from the other camera angle. I don't understand why you think those are two different matters. Sure, of course, Your Honor. Well, looking at the evidence in this case, to one of skill in the art, one would understand that the process of transforming the point of view of an image to the point of view of another image does not always include addressing these sorts of occlusions. There are different levels of complexity in how this is done, but one of skill in the art would still understand that it is a transformation in point of view whether or not those particular types of issues are addressed. So, for example, I think one example of this is if Your Honors would turn to the red brief, page 30. And this we've included an illustration that Apple's expert provided from a textbook showing the knowledge of a procedure at the time. And this is describing how homography works. Homography is a type of registration. Registration as a concept generally is what refers to this transforming one point of view to another. And homography is one example of a registration. And so as seen in this image at the top of page 30 of the red brief, towards the right, you can see that a homography is occurring here. And it's transforming from one point of view, which is kind of on the left, and then a homography called H10. It's a type of registration. It's performed, and then you can see a different point of view is obtained on the right side of that image. And you can see this is more than just moving a picture to a different location. It changes the perspective of the image to a different point of view. So let's assume, which I take it your argument is now assuming, just by assumption, you're not conceding, just by assumption, that point of view means that two cameras have different points of view only if they have different camera angles. And if that's true, then the question is, does Border teach how when you take a picture from camera angle number two and insert it into a background made up of a picture from camera angle one, how the resulting composite has throughout it the camera angle of the background. I don't understand that. I don't understand how Border teaches that, with the possible exception of the couple of passing references to tilt and parallax in, what is it, Paragraphs 41, maybe 48, and 70, which, as Mr. Garrison was careful to note, the Board did not, in fact, rely on. Yes, Your Honor, so Border teaches this transformation in three separate ways and with different degrees of complexity involved in each of those. So the first type of registration, all three of these are referred to as registration generally as a broader concept. The first is this homography that we see here on page 30 of the red brief. This is just an example of what one of skill in the art would have understood it to mean. But not, in fact, from Border, right? No, this is not from Border. But Border refers, tell me if you disagree with this, its matrix transformations are pure, and it says this a couple of times, I think, pure scale and translation. Yes, that is correct, Your Honor. It does say that. However, it also, looking at Border and looking at what one of skill in the art would have understood, a scale and translation is not simply increasing the size of something and moving it over, as corporatonic suggests in its gray brief. This is a more complicated scale that can occur in multiple dimensions. And so you can somewhat see this in the illustration provided in the textbook that Dr. Cassart relied on. You can see that when these two kind of green small rectangles are being transformed to be separate point of view, you can actually see that there's somewhat of a scale that goes beyond the two dimensions. There's some curvature change. Yes, Your Honor, exactly. And so that's what, from the perspective of one of skill in the art, that's what Dr. Cassart explained. Even with a homography, that transformation occurs. It is not simply a scale and translation that means size and move the image. It's a more complicated scale and translation because it occurs in multiple planes. But is that saying anything other than the word homography covers a lot of territory. Not all of it is limited to scale and translation. I took a corporatonic point, is that that may be true about the word homography, but it's not true about the universe of homography that border itself discloses, which is in fact only one subset limited to scale and translation. Again, putting aside the tilt and parallax references which the board did not address. Sure, so in paragraph 38, which the board did rely on, in paragraph 38 of border, this is appendix page 694. Below the text that says the transformation is simply a translation and scale. Below that, below this table, border provides a more complicated aspect when it says the registration can also be stored in the form of the homography that transforms the coordinates of the telephoto to the wide image. And then you can see that in paragraph 39 there's more description of that. And then in paragraph 40 you can see there's a three by three matrix here. In the homography, that represents how this would be occurring on multiple planes. And so, essentially, the paragraph 38 is more than just this transformation. Is this something that Dr. Cossare testified about? What you're now talking about? Yes, John. And the board specifically relied on this  On page, I believe it's page 19 of the board's opinion, they specifically quote this language about the transformation from one point of view to another. Yes, so it's in the middle of page 19, appendix page 19 of the board's opinion. They cite this paragraph 38 and 39, of course, and this particular language is what they cite. In the form of homography that transforms the coordinates of the telephoto image to the wide image. And so that is the more complicated concept of homography that the board actually relied on here. Now, in addition, Your Honor, I do want to point out that even aside from homography, boarder discloses two other types of registration. Can I just double check? I think I just double checked, but if you just continue on in that paragraph, it ends with a citation to paragraph 114 of the Cossare Declaration, which I think is by a long shot the best thing you have. And that actually includes your little picture with the green in it. Yes, Your Honor, that's correct. And again, that picture explains what one of Skilny Art would have understood those terms to mean when reading the boarder reference. So boarder expressly discloses it. It's explained by our expert testimony, which the board specifically credited. And that expert testimony, you don't have to take his word for it. He provides additional evidence of what one of Skilny Art would have understood. And Your Honor, just to briefly go back to your question earlier, there are two additional types of registration that boarder discloses that are even more complex than the homography. So in paragraph 42 and 48 of boarder, boarder discloses feature-based registration. The board didn't rely on 48 or 42, did it? That's correct, Your Honor. The board citations to paragraph 38 are sufficient to affirm the board's decision here because homography is sufficiently complex to perform this point-of-view transformation. But to the extent that, for example, occlusions should be addressed more thoroughly or the court views paragraph 38 as insufficient, there are additional pieces of evidence that Apple cited in its petition at appendix page 136 and Dr. Cassart discussed in his opening declaration in paragraph 112, which, of course, Apple cited in its petition. And those would be additional options for disclosing this point-of-view transformation. Any more questions for Ms. Oliver? This is a good opportunity to explore these complex aspects. Nothing more from me, thank you. Okay. I'm fine, Judge Newman. All right, good. Okay. Ms. Oliver, do you need a last word? Your Honor, we'll just say that in sum that the obviousness determination from the board is well-supported by express disclosures in border as well as expert testimony that the board specifically credited. This is enough to affirm based on substantial evidence review and we respectfully request that the court affirm the board's decision in this case. Thank you. Okay, thank you. All right, Mr. Gallarza, you have your rebuttal time. Thank you, Your Honor. So I would like to address just a few points in the time that I have. First, on the Arthrex issue, what I did hear Ms. Oliver say is that if there were removal of an APJ, then the regional circuits reviewing a mixed case would not be bound by this court's opinion in Arthrex. And I think, Judge Toronto, you may have brought up that it's not an employment case, but the interesting point here is that whether or not they have the protections of Title V. And so what the court essentially did in that remedy was sever Title V and therefore its jurisdiction to kind of hear those employment remedies again. And it doesn't change the case that if it's a mixed case, that employment law remedy would go to the regional circuit. So we don't know necessarily what the precedent would be. And as Ms. Oliver said, the Supreme Court might be the only one to answer. And maybe that is the right answer here as to what the effect of Arthrex is on these very particular facts, which are a bit odd in the way that it's an employment remedy and some of the employment claims might come to this court, some might go to regional circuits, because only the Supreme Court would be able, as a definitive matter, as it will likely in a couple months, decide this issue as to whether or not APJs are constitutionally appointed, and more importantly, what the proper remedy is, and whether that remedy would be carried out and how it should be carried out. Turning to Border, I would like to make a few quick points. So the Board did say that they agreed that construction does not change the analysis in this case, and that's in Apex 8. But when they got to that point, and the first kind of appearance it seems to be is on Apex 22, what the Board said wasn't a factual finding as to why the claim construction didn't matter. They didn't say it doesn't matter because of these facts. What they said is it doesn't matter because we do not agree with the approach to construing the point of view limitation. And so essentially what the Board was saying is we don't think that claim construction is an issue here because we don't agree with the claim construction. And I think that kind of puts the cart before the horse. If the claim construction is proper and point of view is adopted, as Court Photonics argued on 872 of the record, point of view has two aspects, at least two aspects, the position and the perspective. And I think turning to page 30, that part of analysis... Counselor, at the end of the day, aren't we in an area that's decided by substantial evidence? It would be, Your Honor, if it were purely an evidentiary matter, but we believe that at its heart is a claim construction matter, as it was kind of presented fairly in the Blue Brief, in our opinion, that we talked about the shape. And the reason why Border didn't disclose it is because it didn't disclose the shapes and occlusions. Occlusions are just one of those perspective aspects of POV. The POV, the point of view construction, should be camera angle, and that camera angle accounts for position and also perspective. And if we turn to Apple's expert's declaration of paragraph 114 that Judge Sharanto described as potentially the most powerful evidence, that image that's on Apex 652 is the same one that appears in the Red Brief at page 30. If you look at the image labeled B, where it has the XO and the X1, in those little frames, if you're looking at that, those dots are what they're moving. That's the scale and transformation that they're talking about. Those dots are in a different position in each of those elements, and that position is the only factual finding that's in the Board's record here on either Border or Apple's expert's opinion here on paragraph 114, which Apple does say in its Red Brief at page 29, it's, quote, not necessary. But again, the point here is that it's position only, and the proper construction should be position and perspective. I see my time has expired, so we're going to rest on the briefs Are there any more questions for Mr. Gallarza? No, not for me. Okay. Thanks to both counsel. The case was well presented. It's taken under submission.